**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

TOTAL PETROLEUM PUERTO RICO
CORPORATION,

    **Plaintiff,**

        **v.**

MARISELY COLON COLON, *et al.*,

    **Defendants.**

**CIVIL NO.** 08-1629 (FAB)

**OPINION & ORDER**

BESOSA, District Judge

    Pending before the Court are the parties' motions for summary judgment. (Docket Nos. 114, 120, 122, & 125.) Having considered the arguments contained in those motions and the respective oppositions, the Court **GRANTS IN PART AND DENIES IN PART** plaintiff's first and second motions for summary judgment, (Docket Nos. 120, 122, & 125), **DENIES** plaintiff's third motion for summary judgment and **DENIES** defendants' motion for summary judgment, (Docket No. 114). Although plaintiff's first motion for summary judgment is granted with regard to its substantive claims, the Court **HOLDS IN ABEYANCE** its ruling on plaintiff's request for permanent injunctive relief until a final judgment is issued following a bench trial on **February 6, 2012 at 9:00 a.m.**

**DISCUSSION**

**I.    Background**

    **A.    Procedural Background**

On June 6, 2008, Total Petroleum Puerto Rico Corporation ("Total/GPR") filed a complaint against Marisely Colon Colon ("M. Colon"), Luis F. Colon ("L. Colon"), and their conjugal partnership (collectively "defendants"), alleging claims pursuant to the Lanham Act, the Petroleum Marketing Practices Act, and Puerto Rico law revolving around the lease and possession of a gasoline service station in Coamo, Puerto Rico. (Docket No. 99.) On the same date, Total/GPR filed a motion for a temporary restraining order ("TRO") and a preliminary injunction, requesting that the Court order defendants "to immediately surrender the station, the Underground Storage Tanks, and all other equipment therein to [Total/GPR], to immediately comply with all other post-termination covenants of the Lease, Dealer and Commodatum Agreements, and to refrain from using the GPR MARKS." (Docket No. 2 at 34.) On June 9, 2008, the Court denied the request for a TRO and referred the motion for a preliminary injunction to then Chief Magistrate Judge Justo Arenas. (Docket No. 5.)

On June 24, 2008, the magistrate judge held an evidentiary hearing to resolve the issues presented in the motion for a preliminary injunction. On July 30, 2008, the magistrate judge issued a report and recommendation concluding that the Court

should grant a preliminary injunction directing defendants to "(1) immediately surrender the gasoline station . . . ; (2) immediately comply with all post-termination covenants of the Lease, Supply and Commodatum Agreements to which the defendants are signatories; [and] (3) immediately cease using the well-known GPR marks." (Docket No. 32 at 32.) On August 29, 2008, the Court adopted the report and recommendation as its opinion and granted the preliminary injunction. (Docket No. 45.)

Approximately a month and half later, the parties filed informative motions which indicated a dispute over defendants' compliance with the preliminary injunction issued by the Court. (Docket Nos. 46 & 48.) On October 16, 2008, the Court referred the informative motions to a magistrate judge to hold a hearing to determine whether the defendants had not fully complied with the preliminary injunction. (Docket No. 49.) After resolving several scheduling matters, the magistrate judge held an evidentiary hearing on August 13, 2009. (Docket No. 77.) On December 3, 2009, the magistrate judge issued a report and recommendation concluding that defendants were not in violation of the order granting a preliminary injunction. (Docket No. 83.) On March 1, 2010, the Court adopted the report and recommendation as its own opinion, and referred the case once again to a magistrate judge for all remaining pretrial matters. (Docket No. 87.)

On June 22, 2011, the parties indicated during a pretrial
conference that the majority of the issues in this case could be
resolved summarily by the Court.  (Docket No. 109.)  In an effort
to conserve judicial resources, the Court vacated the trial date
and ordered the parties to file cross motions for summary judgment
on the issues discussed at the pretrial conference no later than
July 15, 2011.  Id.  The Court subsequently extended that deadline
to July 20, 2011.  (Docket No. 113.)  On July 20, 2011, the parties
filed several motions for summary judgment.  Defendants filed a
motion for summary judgment arguing that plaintiffs claims are
meritless and requesting that the Court grant the relief requested
in their counterclaim.  (Docket No. 114.)  Plaintiff filed a timely
opposition to that motion on August 5, 2011.  (Docket No. 139.)

Plaintiff filed three separate motions for summary
judgment, each addressing different sets of claims in this case.
(Docket Nos. 120, 122, & 125.)  Plaintiff argues in its first
motion for summary judgment:  (1) that its termination of the
franchise relationship with defendants was valid under the PMPA;
and (2) that a permanent injunction should issue to prevent
defendant from further diluting or infringing plaintiff's
trademarks.  (Docket No. 120.)  In its second motion for summary
judgment, plaintiff argues that defendants breached their
contractual obligations to plaintiff and, as a result, still owe
plaintiff $83,605.50 under the terms of the franchise and lease

agreements.   (Docket No. 122.)   Plaintiff's final motion for
summary judgment requests that the Court find that plaintiff is the
owner of a concrete structure, currently used as a cafeteria,
adjacent to the gas station at issue in this case, along with the
premises of the concrete structure.  (Docket No. 125.)  Defendants
filed an opposition only with regard to plaintiff's first motion
for summary judgment.  (Docket No. 138.)

    **B.   Failure to Comply with Local Rule 56**

        The First Circuit Court of Appeals has "repeatedly . . .
emphasized the importance of local rules similar to Local Rule 56
[of the District of Puerto Rico]."  <u>Caban Hernandez v. Phillip
Morris USA, Inc.</u>, 486 F.3d 1, 7 (1st Cir. 2007).  Rules such as
Local Rule 56 "are designed to function as a means of 'focusing a
district court's attention on what is - and what is not - genuinely
controverted.'"  <u>Id</u>. (quoting <u>Calvi v. Knox County</u>, 470 F.3d 422,
427 (1st Cir. 2006)).  Due to the importance of this function to
the summary judgment process, "litigants ignore [those rules] at
their peril."  <u>Id</u>.  Plaintiff argues that defendants have run afoul
of Local Rule 56's scheme for submission of factual material in two
respects.  (Docket Nos. 139 & 140.)  The Court will address each
argument in turn.

        **1.   Defendants' Motion for Summary Judgment**

        Plaintiff argues that defendants' motion for summary
judgment fails to comply with Local Rule 56(b) or Local Rule 56(e).

(Docket No. 139.)  Local Rule 56(b) requires a party moving for summary judgment to submit factual assertions in "a separate, short, and concise statement of material facts, set forth in numbered paragraphs," which must be in compliance with Local Rule 56(e).  D.P.R. Civ. R. 56(b).  Local Rule 56(e) states that:

> Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted.  An assertion of fact set forth in a statement of material facts **shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion.**  The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment.  **The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.**

D.P.R. Civ. R. 56(e) (emphasis added); (Docket No. 139.)

Plaintiff claims that defendants did not submit their factual assertions in a separate document, or support those assertions with specific references to pages or paragraphs of exhibits.  (Docket No. 139.)  Plaintiff argues that, due to this failure, the Court should deny defendants' motion for summary judgment.  (Docket No. 139.)  Indeed, defendants did not file a separate statement of uncontested facts, choosing instead to include all factual material in the body of their summary judgment motion.  (<u>See</u> Docket No. 114.)  Even within that motion, defendants fail in many instances to cite to any exhibit to support factual assertions.  <u>See</u> <u>id</u>.  In cases where defendants do include a record

Civil No. 08-1629 (FAB)                                                    7

citation, they decline to provide a specific reference to page or
paragraph number as required by Local Rule 56(e).  (See Docket
No. 33-1.)

As previously explained, the purpose of Local
Rule 56 is to create an organized and clear representation of
issues of fact which are truly contested between the parties.  See
Caban Hernandez, 486 at 7-8.  By failing to provide such a
representation, defendants are effectively asking the Court to
ferret through their exhibits in order to rule on their motion for
summary judgment.  The Court declines to do so and reminds
defendants that it has "no independent duty to search or consider
any part of the record not specifically referenced in the parties'
separate statement of facts."  See Local Rule 56(e).  Based on the
absence of a properly presented factual record, the Court cannot
determine the existence, or absence, of genuine issues of material
fact and **DENIES** defendants' motion for summary judgment.  See
Fed.R.Civ.P. 56(c); see also Santiago-Ramos v. Centennial P.R.
Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000); Vargas-Ruiz v.
Golden Arch Development, Inc., 283 F. Supp. 2d 450, 458-59 (D.P.R.
2003).

2.   **Defendants' Opposition**

As recounted in the procedural background,
defendants only filed a response in opposition to plaintiff's first
motion for summary judgment, leaving plaintiff's other two motions

for summary judgment unopposed.  (See Docket No. 138.)  Plaintiff
argues that defendants' opposition fails to comply with Local
Rule 56(c) and consequently does not contest properly the factual
assertions submitted by plaintiff.  Local Rule 56(c) requires a non-
moving party to file with its opposition "a separate, short, and
concise statement of material facts" which shall "admit, deny or
qualify the facts by reference to each numbered paragraph of the
moving party's statement of material facts and unless a fact is
admitted, shall support each denial or qualification by a record
citation as required by this rule."  D.P.R. Civ. R. 56(c).  Local
Rule 56(c) also requires that, if the nonmoving party includes any
additional facts, such facts must be in a separate section, set
forth in separate numbered paragraphs, and be supported by a record
citation.  Id.

        Where a party does not act in compliance with Local
Rule 56(c), "a district court is free, in the exercise of its sound
discretion, to accept the moving party's facts as stated."  Id.
(citing Cosme-Rosado v. Serrano-Rodriguez, 360 F.3d 42, 45 (1st
Cir. 2004)).  In Caban Hernandez v. Phillip Morris USA, Inc., 486
F.3d 1, 7-8 (1st Cir. 2007), the First Circuit Court of Appeals
held that, in the context of a motion for summary judgment, where
a non-moving party does not admit, deny, or qualify the moving
party's assertions of fact as required by Local Rule 56(c), but
instead files an "alternate statement of facts in narrative form,"

a district court is justified in issuing an order deeming the moving party's assertions of fact admitted.

Defendants have failed to comply with the requirements of Local Rule 56(c). First, similar to the failure to support their own motion for summary judgment properly, defendants did not respond to plaintiffs' statement of uncontested facts in a separate statement with appropriate record citation. (See Docket No. 138.) Furthermore, defendants completely neglected to admit, deny, or qualify plaintiff's factual assertions. See id. Instead of following the Local Rules' prescribed procedure for responding to plaintiff's statement of uncontested facts, defendants attempt to avoid the "rigors that [Local Rule 56] imposes . . . [,]" ignoring their responsibility to address specifically each assertion contained in defendants' statement of material facts and launching into a narrative explanation of the facts in this case. See Caban Hernandez, 486 F.3d at 7.

Defendants have chosen to shirk their responsibility to provide an accurate representation of issues of fact which are truly contested in this case, and must now face the consequences of that decision. The factual background defendants attempt to include within their response to plaintiff's first motion for summary judgment will not be considered in determining uncontested factual issues in the resolution of summary judgment proceedings in this case. The assertions contained in plaintiff's statement of

material facts, (Docket No. 121), are **DEEMED ADMITTED**.
Furthermore, the statements of uncontested facts, (Docket Nos. 123
& 126), included with plaintiff's second and third motions for
summary judgment are **DEEMED ADMITTED** because of defendants' failure
to oppose them. Accordingly, plaintiff's statements of uncontested
facts, in conjunction with their supporting exhibits, will form the
**SOLE BASIS** for the factual background of this opinion and order
ruling on plaintiff's three motions for summary judgment, (Docket
Nos. 120, 122 & 125).

    **C.   Factual Background**

        **1.   Identity of the Parties and Corporate Background**

        Total/GPR is a corporation organized under the laws
of the Commonwealth of Puerto Rico, with its principal place of
business located in Guaynabo, Puerto Rico. (Docket No. 121 at ¶ 1;
Docket No. 121-1 at ¶ 4.) M. Colon is the individual who was
authorized to operate the gasoline service station ("service
station") in Coamo. (Docket No. 121 at ¶ 2; Docket No. 1.) L.
Colon is married to M. Colon, but is not himself the designated
franchisee or gasoline retailer for the gasoline service station.
(Docket No. 121 at ¶ 3; Docket No. 1.)

        In 1970, Sinclair Caribbean Oil Company
("Sinclair"), later known as Arco Caribbean Inc. ("Arco"), acquired
the land where the service station is located through a deed of
purchase. (Docket No. 121 at ¶ 4; Docket No. 108.) After

acquiring the land, Sinclair built the service station.  (Docket No. 121 at ¶ 5; Docket No. 108.)  Isla Petroleum Corporation ("Isla"), acquired the service station from Arco, through deed of purchase and sale dated August 3, 1981, for the amount of $25,000. (Docket No. 121 at ¶ 6; Docket No. 108.)  On July 15, 1997, Gasolinas de Puerto Rico ("GPR"), which had been in existence since 1974, merged with and into Isla.  (Docket No. 121 at ¶ 7; Docket No. 121-1 at ¶ 3.)  Although Isla was the surviving company, it subsequently changed its name to GPR.  Id.  On November 18, 2004, Total sent a notice to all retailers, including M. Colon, announcing that all of GPR's stock had been acquired by Total Outre Mer, S.A. ("Total, S.A."), a wholly owned subsidiary of Total Group.  (Docket No. 121 at ¶ 8; Docket No. 108.)  The notice also stated that after the acquisition, GPR changed its name to Total Petroleum Puerto Rico Corporation ("Total/GPR").  (Docket No. 121 at ¶ 9; Docket No. 108.)  As a result of the stock purchase, Total/GPR acquired the rights over the GPR marks.  (Docket No. 121 at ¶ 10; Docket No. 121-1 at ¶ 2.)

### 2.   Terms of the Franchise Agreement

On August 19, 1991, defendants entered into a one year trial Franchise Agreement with Total/GPR's predecessor, Isla, including Commodatum, Sales and Supply and Lease Agreements. (Docket No. 121 at ¶ 11; Docket No. 108.)  On March 1, 1993, Isla and defendants entered into a second Franchise Agreement, renewing

the first agreement for a term of three years beginning on March 1, 1993 and ending on February 28, 1996.  (Docket No. 121 at ¶ 13; Docket No. 108.)  Pursuant to the Second Franchise Agreement, the parties could continue to renew the agreement on a month-to-month basis after its expiration on February 28, 1996.  Id.

As part of the Franchise Agreement, defendants entered into a Lease Agreement with Total/GPR ("the Lease") in order to operate the service station.  (Docket No. 121 at ¶ 14; Docket No. 108.)  Total/GPR is the owner of the real property in Coamo on which the service station is located.  Id.  The service station had been operating at that site under GPR marks for over fifteen years.  (Docket No. 121 at ¶ 15; Docket No. 108.)  The Lease states that the operation of a gasoline service station was the primary purpose for entering into that agreement.  (Docket No. 121 at ¶ 16; Docket No. 108.)  In the Lease, defendants expressly recognize that at the moment the agreement was entered, the property was fully equipped and qualified to be used as a gasoline service station.  (Docket No. 121 at ¶ 17; Docket No. 108.)

Defendants also recognize in the Lease that all the structures, facilities, and certain additional equipment used for the operation of the service station, and which were located at the premises at the time of the agreement, are property of Total/GPR. (Docket No. 121 at ¶ 18; Docket No. 108.)  The Lease provides that

defendants would pay Total/GPR a monthly rent based on the service station's gasoline sales volumes of two cents per gallon of product sold, but never an amount less than the minimum monthly rent established for each year of contract: (1) for the first year, a minimum monthly rent of seven hundred dollars; (2) for the second year, a minimum monthly rent of seven hundred and fifty dollars; and (3) for the third year of the contract, a minimum monthly rent of eight hundred dollars. (Docket No. 121 at ¶ 20; Docket No. 108.) The Lease further provides that rent is payable the first day of each month. Id. The Lease provides that in the event that defendants failed to comply with any of their duties under such agreement, Total/GPR was entitled to terminate it. (Docket No. 121 at ¶ 23; Docket No. 108.) Furthermore, the Lease authorizes the termination of the agreement under the following specific circumstances, among others: the occurrence of an event which constitutes a breach of contract; if the dealer fails to make his best effort to comply with the provisions of the contract; in the event that the dealer fails to pay any amounts owed under the contract; in the event that the dealer fails to operate the service station for seven consecutive days or any lesser period of time unreasonable under the circumstances; in the event the dealer adulterates the petroleum products; in the event the dealer violates Total/GPR's marks; or for any termination grounds

Civil No. 08-1629 (FAB)                                                    14

available under applicable law.  (Docket No. 121 at ¶ 24; Docket
No. 108.)

   As part of the Franchise Agreement, Total/GPR and
defendants entered into a Supply Agreement pursuant to which
defendants were granted the right to buy and resell Total/GPR
petroleum products and to operate a gasoline service station under
that trademark.  (Docket No. 121 at ¶ 25; Docket No. 108.)  Article
Four of the Supply Agreement provides that defendants would pay
each delivery of product before or at the time of delivery.
(Docket No. 121 at ¶ 27; Docket No. 108.)  Article Seventeen of the
Supply Agreement provides that in the event that defendants failed
to comply with any of their duties under the Supply Agreement,
Total/GPR was entitled to suspend the delivery of petroleum
products and terminate the agreement.  (Docket No. 121 at ¶ 28;
Docket No. 108.)  Article Eight (8) of the Supply Agreement
authorizes the termination of the agreement under the following
circumstances, among others:  the occurrence of an event which
constitutes a breach of contract; if the dealer fails to make his
best effort to comply with the provisions of the agreement; in the
event that the dealer fails to comply with any and all applicable
environmental laws and regulations; in the event the dealer
adulterated the petroleum product; in the event the dealer violates
GPR's trademark; or for any termination grounds applicable under
applicable law.  (Docket No. 121 at ¶ 29; Docket No. 108.)

### 3.    Renewal Negotiations and Franchise Termination

At the end of the three year term of the Franchise Agreement, the parties began negotiations to renew the franchise. (Docket No. 121 at ¶ 30; Docket No. 108.)  In mid 1997, Total/GPR offered defendants a new Franchise Agreement.  (Docket No. 121 at ¶ 31; Docket No. 108.)  The main change with regard to the previous Franchise Agreements was an increase of fifty dollars ($50.00) with regard to the Lease of the real estate property.  Id.  Defendants never renewed the Franchise Agreements.  (Docket No. 121 at ¶ 32; Docket No. 108.)  Defendants occupied the property on a month-to-month basis until August 29, 2008, when they were ordered to surrender it to Total/GPR after a preliminary injunction was granted pursuant to Total/GPR's request.  (Docket No. 121 at ¶ 33; Docket No. 108.)  From 1997 until 2008, defendants did not pay the rent established in the Lease Agreement.  (Docket No. 121 at ¶ 34; Docket No. 108; Docket No. 145-1 at 2, 4-6, 18-22.)  From 1997 until 2008, defendants paid Total/GPR a monthly rent based on the station's gasoline sales volumes of two cents ($0.02) per gallon of product sold, but did not pay the minimum monthly rent established in the contract for each specific year, as established in the Lease.  (Docket No. 121 at ¶ 35; Docket No. 108; Docket No. 145-1 at 2, 4-6, 19-21.)

Total/GPR notified defendants that the rent payment was incomplete and would send documents with the outstanding debt.

(Docket No. 121 at ¶ 36; Docket No. 121-1 at ¶ 16; Docket No. 145-1 at 9-12, 29-30.)  On November 13, 1998, defendants filed a judicial complaint before the Puerto Rico Court of First Instance, Ponce Superior Division, case number JDP1998-0499, claiming, among other things, that Total/GPR had overcharged defendants for rent since 1991, based on the Rules and Regulations of the Puerto Rico Department of Consumer Affairs ("DACO").  (Docket No. 121 at ¶ 37; Docket No. 108.)   The case was later transferred to San Juan Division under Civil Number KAC-1999-0393.   (Docket No. 121 at ¶ 38; Docket No. 108.)  The case before the Court of First Instance was dismissed on January 19, 2005.  (Docket No. 121 at ¶ 39; Docket No. 108.)

On January 16, 2003, following an agreement between the parties, defendants filed a petition before DACO requesting the agency to establish the maximum applicable rent for the subject service station, review the rent stipulated on the Lease, and determine whether the amount was valid pursuant to DACO's Regulation No. 2758.  (Docket No. 121 at ¶ 40; Docket No. 108.)  As part of the procedure before DACO, Total/GPR submitted evidence of the equipment found at the service station, the improvements made over the years, the cost of acquisition and the property taxes paid for the station, among other evidence.  (Docket No. 121 at ¶ 41; Docket No. 121-1 at ¶ 19.)  An evidentiary hearing was held before DACO where the parties were granted the opportunity to present

their  evidence  and  establish  their  position  regarding  the
controversy.  (Docket No. 121 at ¶ 42; Docket No. 121-1 at ¶ 19.)
Total/GPR  and  defendants  had  agreed  to  submit  the  issue  before
DACO, given its expertise regarding this matter.  (Docket No. 121
at ¶ 43; Docket No. 108.)  After the numerous proceedings before
DACO and the Puerto Rico Court of Appeals, DACO issued a resolution
on  June  23,  2008,  establishing  the  maximum  monthly  rent  for  the
service  station  at  $1,042.83.  (Docket  No.  121  at  ¶  44;  Docket
No. 108.)

        The June 23, 2008 Resolution establishing a maximum
monthly rent of $1,042.83 for the service station was DACO's final
decision regarding this matter.  (Docket No. 121 at ¶ 45; Docket
No. 108; Docket No. 121-1 at ¶ 20.)  According to DACO's June 23,
2008 Resolution, the maximum rent was to be effective retroactively
since the filing of the petition.  (Docket No. 121 at ¶ 46; Docket
No. 108.)  Defendants did not seek review before the Puerto Rico
Court of Appeals from the June 23, 2008, Resolution.  (Docket
No. 121 at ¶ 47; Docket No. 121-1 at ¶ 21.)

        In  December,  1998,  Total/GPR  replaced  the
underground storage tanks ("UST") in the service station.  (Docket
No. 121 at ¶ 52; Docket No. 121-1 at ¶ 26-27; Docket No. 145-1
at 7-8.)  After the replacement of the USTs, defendants received
gasoline products worth $11,316.00.  (Docket No. 121 at ¶ 53;
Docket No. 121-1 at ¶ 25-26; Docket No. 145-1 at 13-15, 26-29.)

Defendants sold that gasoline product to consumers. (Docket No. 121 at ¶ 54; Docket No. 145-1 at 27.) Defendants did not pay, and still owe, Total/GPR for that gasoline product. (Docket No. 121 at ¶ 55; Docket No. 121-1 at ¶ 26-27; Docket No. 145-1 at 15, 28.) During that same period of time, defendants were given a credit on the rent for the time the service station was closed for construction due to the replacement of the underground storage tanks. (Docket No. 121 at ¶ 56; Docket No. 121-1 at ¶ 223-24.) They were also given credit for the gasoline product found in the old tanks removed from the station. Id. On April 25, 2003, Total/GPR sent defendants a written communication informing them that since 1998 they had not purchased petroleum-based products from the company. (Docket No. 121 at ¶ 57; Docket No. 108; Docket No. 145-6.)

The letter also asserted that defendants owed Total/GPR $3,166.23, for petroleum-based products previously purchased. (Docket No. 121 at ¶ 58; Docket No. 108; Docket No. 145-6.) The letter also asserted that defendants stopped buying petroleum-based products, such as engine oil, from the company in 1998. (Docket No. 121 at ¶ 59; Docket No. 108; Docket No. 145-6.) Defendants admitted that they instead bought petroleum-based products from third parties, such as Sam's Club. (Docket No. 121 at ¶ 60; Docket No. 145-1 at 16-17; Docket No. 145-4 at 2.) On the April 25, 2003 letter, Total/GPR also informed

defendants that they owed the company 52 months of rent. (Docket
No. 121 at ¶ 61; Docket No. 108; Docket No. 145-6.)  On December
21, 2007, Total/GPR sent defendants a written communication
informing them that they owed the company $71,833.51 for unpaid
rent and $11,771.99 for other products sold. (Docket No. 121 at
¶ 62; Docket No. 108; Docket No. 121-1 at ¶ 28; Docket No. 121-11
at 3-4.)  The letter requested payment for those amounts within
ninety (90) days. Id.  The letter also advised defendants that
noncompliance could result in the termination of the Franchise
Agreements. Id.  On March 24, 2008, Total/GPR sent defendants a
Notice of Termination granting a final term of fifteen (15) days to
pay all amounts owed and stating that once payment was effected GPR
would be willing to renew the franchise agreement based on a
minimum monthly rent of eight hundred fifty dollars ($850.00) as
had been proposed since 1998.  Defendants never answered that
letter. (Docket No. 121 at ¶ 63; Docket No. 108; Docket No. 121-12
at 6-8.)

      The March 24, 2008 letter included a detailed
statement of the rent owed since 1998 ($69,673.51), the amounts
owed for gasoline product (invoices 45588 and 45610)($11,316.00)
and other petroleum-based products owed to the company. (Docket
No. 121 at ¶ 64; Docket No. 108; Docket No. 121-12 at 6-8.)  The
letter informed defendants that they owed Total/GPR a total of
$81,445.50. Id.  On June 5, 2008, Total Petroleum Puerto Rico

Corp., sent defendants a notice of termination and non-renewal
regarding the franchise relationship. (Docket No. 121 at ¶ 65;
Docket No. 108; Docket No. 121-11 at 3-4.) The termination notice
included a "Summary Statement" prepared by the Secretary of Energy,
as required by Article 104(c)(3) of the PMPA, 15 U.S.C.
§ 2804(c)(3), and requested defendants to turn over the station to
GPR. (Docket No. 121 at ¶ 66; Docket No. 108; Docket No. 121-13
at 5-22.) The termination notice also stated that defendants'
franchise was being terminated due to their repeated breach of
contract and failure to agree to changes and/or additions to the
franchise agreement in the normal course of business. (Docket
No. 121 at ¶ 67; Docket No. 108; Docket No. 121-13 at 5-22.) The
termination notice informed defendants that they owed Total/GPR a
total of $83,605.50 ($71,833.51 for rent and $11,771.99 for
gasoline and petroleum-based products) and included a detailed
statement regarding those amounts. (Docket No. 121 at ¶ 68; Docket
No. 108; Docket No. 121-13 at 5-22.) The termination letter
requested that defendants surrender the service station and the
equipment located in it. (Docket No. 121 at ¶ 69; Docket No. 108;
Docket No. 121-13 at 5-22.)

          Defendants have not paid the outstanding amounts
owed to Total/GPR for rent, gasoline and petroleum products which
total $83,605.50, plus interest. (Docket No. 121 at ¶ 71; Docket
No. 108; Docket No. 121-1 at ¶ 31.) After the June 5, 2008, termination letter,

defendants refused to surrender the service station, were not selling Total/GPR gasoline, but continued to display the GPR marks. (Docket No. 121 at ¶ 72; Docket No. 121-1 at ¶¶ 33-35.)  After the termination, and while displaying the GPR marks, defendants displayed signs stating that there was no gasoline at the service station.  (Docket No. 121 at ¶ 73; Docket No. 121-1 at ¶¶ 33-35.)

## II.  Legal Analysis

### A.  Summary Judgment Standard

The Court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  The rule states, in pertinent part, that the court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED.R.CIV.P. 56(c); see also Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once a properly supported motion has been presented, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the Court's denial of the motion for summary judgment.  For issues where the opposing party bears

the ultimate burden of proof, that party cannot merely rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute.  See Suarez v. Pueblo Int'l., Inc., 229 F.3d 49, 53 (1st Cir. 2000).

In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine."  Material means that a contested fact has the potential to change the outcome of the suit under governing law. The issue is genuine when a reasonable jury could return a verdict for the nonmoving party based on the evidence.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  It is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment.  Id. at 252.  It is therefore necessary that "a party opposing summary judgment must present definite, competent evidence to rebut the motion."  Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).

In making this assessment, the Court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor."  Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).  The court may safely ignore, however, "conclusory allegations, improbable inferences, and unsupported speculation."

Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.
1990).

**B.    Validity of Franchise Termination under the PMPA**

Plaintiff requests that the Court reiterate its previous
conclusion that the termination of the franchise agreement in this
case was valid pursuant to the PMPA.  (Docket No. 120 at 11-16.)
The PMPA seeks to mitigate the unequal bargaining power franchisors
hold over franchisees.  See Marcoux v. Shell Oil Prods. Co. LLC,
524 F.3d 33, 39 (1st Cir. 2008) (citing S. Rep. No. 95-731, 95th
Cong., 2d Sess. 18, 1978 U.S. Code Cong. & Admin. News 873, 876;
Four Corners Serv. Station v. Mobil Oil Corp., 51 F.3d 306, 310
(1st Cir. 1995)).  "Because franchisees claimed that this unequal
power was often wielded through arbitrary or discriminatory
termination or nonrenewal, or *threats* of termination or nonrenewal,
the PMPA aimed to remove this potent weapon from the franchisors'
arsenal."  Id. (emphasis in original).  To achieve that goal, the
PMPA limits the bases on which a franchisor may terminate or
decline to renew a franchise.  Id.

One valid ground for terminating a franchise is "[t]he
occurrence of an event which is relevant to the franchise
relationship and as a result of which termination of the franchise
or nonrenewal of the franchise relationship is reasonable . . . ."
15 U.S.C. § 2802(b)(2)(C).  In defining such events, the PMPA
includes the "failure by the franchisee to pay to the franchisor in

a timely manner when due all sums to which the franchisor is legally entitled . . . ."  15 U.S.C. 2802(c)(8).  When an event triggering a franchisor's termination of the franchise falls within that definition, the "termination is conclusively presumed to be reasonable as a matter of law."  See Desfosses v. Wallace Energy, Inc., 836 F.2d 22, 26 (1st Cir. 1987).

During the preliminary injunction proceedings in this case, the Court concluded that "[s]ince plaintiff's evidence satisfies the regulations of the PMPA for terminating a contract, such termination is presumed to be reasonable, and the termination of the contract was valid." (Docket No. 32 at 19.)  Nothing in the summary judgment pleadings suggests any basis for altering that conclusion.  It is uncontested that defendants ceased paying the minimum monthly rent stipulated in the Lease agreement.  (Docket No. 121 at ¶ 34; Docket No. 145-1 at 2, 4-6, 18-22.)  Doing so constitutes one of the permissible grounds for terminating a franchise under the PMPA.  See 15 U.S.C. § 2802(b)(2)(C); 15 U.S.C. 2802(c)(8).

Defendants only argument regarding the validity of Total's termination of the franchise relates to their claim in local administrative and judicial fora that the rent stipulated in the Lease agreement was excessive pursuant to a local regulation. (See Docket No. 138.)  Those claims, however, appear to have ended with DACO's determination that the maximum monthly rent that could

be charged for the gasoline service station was $1,042.83, well above the minimum rent set in the Lease agreement, which defendants continuously failed to meet.  (See Docket No. 121 at ¶¶ 44-47; Docket No. 108; Docket No. 121-1 at ¶ 21.)  Thus, defendants' prior claims regarding the amount of rent present no obstacle to the validity of Total/GPR's termination of the franchise pursuant to the PMPA.  Given that the uncontested facts demonstrate a situation which clearly falls into one of the justifiable bases for termination of a franchise under the PMPA, the Court finds that Total's termination of the franchise for the gasoline service station with defendants was valid according to that statute.

C.   **Trademark Infringement and Dilution**

Plaintiff requests that the Court grant summary judgment in its favor regarding the claims of trademark infringement and dilution alleged in the complaint.  (See Docket No. 120.)  "The purpose of trademark laws is to prevent the use of the same or similar marks in a way that confuses the public about the actual source of the goods or service."  Star Financial Servs., Inc. v. AASTAR Mortgage Corp., 89 F.3d 5, 9 (1st Cir. 1996) (citing De Costa v. Viacom Int'l., Inc., 981 F.2d 602, 605 (1st Cir. 1992), cert. denied, 509 U.S. 923 (1993)).  "Confusion about the source exists when a buyer is likely to purchase one product in the belief she was buying another and is thus potentially prevented from obtaining the product she actually wants."  Id.

"To prevail in an action for trademark (or service mark) infringement, the plaintiff must establish:  '1) that he uses, and thereby owns, a mark, 2) that the defendant is using that same or a similar mark, and 3) that the defendant's use is likely to confuse the public, thereby harming the plaintiff.'"  Id.   To determine whether confusion is likely, the First Circuit Court of Appeals has outlined several relevant factors, including:

> (1) the similarity of the marks; (2) the similarity of the goods (or, in a service mark case, the services); (3) the relationship between the parties' channels of trade; (4) the juxtaposition of their advertising; (5) the classes of prospective purchasers; (6) the evidence of actual confusion; (7) the defendant's intent in adopting its allegedly infringing mark; and (8) the strength of the plaintiff's mark.

The Shell Co. (Puerto Rico) Ltd. v. Los Frailes Serv. Station, Inc., 605 F.3d 10, 21-22 n. 9 (1st Cir. 2010) (citing Int'l. Ass'n. of Machinists v. Winship Green Nursing Ctr., 103 F.3d 196, 201 (1st Cir. 1996); Visible Sys. Corp. v. Unisys Corp., 551 F.3d 65, 73 (1st Cir. 2008)).  Those factors are "merely illustrative, however; the purpose of the inquiry is simply to determine whether 'the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.'"  Id. at 22 (quoting Int'l. Ass'n. of Machinists, 103 F.3d at 201).

The only argument defendants proffer with regard to plaintiff's trademark infringement and dilution claims is that plaintiff abandoned the GPR marks at issue in this case upon the

corporate name change that occurred on November 18, 2004, when
Total/GPR's parent corporation purchased GPR. (See Docket
No. 138.) Defendants develop that argument no further than making
brief reference to the statutory language recognizing abandonment
of a trademark and the letter announcing Total, S.A.'s acquisition
of GPR. See id. Furthermore, defendants provide no proper
evidentiary support for that argument. See id. The uncontested
facts on summary judgment confirm the Court's previous ruling
regarding plaintiff's ownership of the Total/GPR marks used at the
service station. (See Docket No. 32; Docket No. 121-1 at ¶ 2.) It
is clear that Total/GPR acquired the GPR marks when it purchased
GPR and there is no suggestion in the factual background of this
case that Total/GPR ever abandoned those marks.

        Pinning their hopes on the abandonment argument,
defendants do not contest the Court's findings at the preliminary
injunction stage that "consumers [had] no real notice of the fact
that the gasoline service station [was] no longer a Total/GPR
station" and that there was a "very high" likelihood of consumer
confusion. (See Docket Nos. 32 & 138.) The uncontested facts
reflect that despite the termination of the franchise pursuant to
the PMPA, defendants continued to use Total/GPR marks at the
gasoline service station up until the issuance of a preliminary
injunction on August 29, 2008. It is also clear that while
displaying those marks, defendants sold non-Total/GPR petroleum

products and later represented that the service station no longer
sold gasoline.  (<u>See</u> Docket No. 121-1 at ¶¶ 33-35; 145-1 at 16-17;
Docket No. 145-4 at 2.)   Given these uncontested facts, there
appears to be no genuine issue of material fact that defendants'
actions created a high likelihood of consumer confusion, thus
infringing on, and diluting, the Total/GPR marks.

   **D.   Breach of Contract Claims**

        Plaintiff requests monetary damages for unpaid rent and
petroleum products pursuant to the terms of the Lease and Supply
agreements.   "To properly assert a claim for breach of contract, a
party must sufficiently allege (1) a valid contract, (2) breach of
that contract, and (3) resulting damages."  <u>First Medical Health
Plan, Inc. v. Carmark PCS Caribbean, Inc.</u>, 681 F. Supp. 2d 111, 116
(D.P.R. 2010).   After the breakdown of negotiations to renew the
franchise agreement, defendants continued to occupy the service
station on a month-to-month basis.   Under both the terms of the
Lease Agreement and Puerto Rico law, "it is assumed that this new
contract is subject to the same conditions and to the same rental
rate of the former [agreement]."  <u>See</u> <u>Dalmau v. Hernandez Saldana</u>,
3 P.R. Offic. Trans. 678, (P.R. 1975).

        Although defendants did not oppose plaintiff's motion for
summary judgment on the breach of contract claim, their opposition
to plaintiff's first motion for summary judgment does challenge the
validity of the agreements between the parties by arguing that the

rent stipulated in the lease agreement was excessive according to local law. (See Docket No. 138.) As discussed above, however, DACO resolved the maximum rent applicable to the gasoline service station and defendants failed to appeal that resolution. (See Docket No. 121 at ¶¶ 44-47; Docket No. 108; Docket No. 121-1 at ¶ 21.) The maximum rent established by DACO, $1,042.83, is more than the final minimum rent of $800 established in the Lease. See id. Thus, plaintiff's argument regarding the allegedly excessive nature of the rent established in the Lease impedes neither the validity of the contract in this case, nor the Court's resolution of the issue on summary judgment.

Defendants readily admit that they ceased paying the monthly minimum rent established in the most recent lease agreement, paying only two cents per gallon of gasoline sold at the service station. (See Docket No. 145-1 at 2, 4-6, 19-21.) The uncontested facts show that plaintiff notified defendants of the amount of unpaid rent, including invoices showing the amount of unpaid rent for each month during the period of time after defendants stopped paying the correct amount. (See Docket No. 121-1 at ¶¶ 28-29; Docket No. 121-12 at 6-8; Docket No. 121-13 at 5-22.) Plaintiff also provided defendants with invoices regarding unpaid amounts due under the supply agreement for petroleum products. See id. Those invoices include $71,833.51 for unpaid rent and $11,771.99 for unpaid petroleum products. See id. Given

these uncontested facts, it is clear that defendants breached their agreements with plaintiff by failing to pay the correct amounts for petroleum products and rent and that defendants' breach caused damages in the form of those unpaid sums.  Accordingly, it appears that summary judgment is appropriate on plaintiff's breach of contract claim.

**E.    Cafeteria Structure**

On June 22, 2011, a final pretrial conference was held, during which the parties expressed that the majority of the issues in this case could be resolved summarily.  (<u>See</u> Docket No. 109.) As previously recounted in the procedural background, the Court vacated the trial date and allowed the parties to file cross motions for summary judgment.   <u>Id</u>.   At the final pretrial conference, the issues on which the parties concurred that summary judgment would be appropriate did not include the boundary issue relevant to the ownership of the disputed cafeteria structure.  <u>See</u> <u>id</u>.   Despite this, plaintiff filed a third motion for summary judgment regarding the boundary issue.  (<u>See</u> Docket No. 125.)

That issue was the subject of a hearing and report and recommendation which was adopted as the Court's opinion.  (Docket No. 83.)  In the course of that report and recommendation, the magistrate judge concluded that the issue could not be finally resolved on the evidence presented at the hearing and found it more

appropriate to withhold any judgment deciding the ownership of the cafeteria structure until trial.   (Docket No. 83.)

The summary judgment record also leaves sufficient doubt regarding the boundary issue to preclude entering judgment as a matter of law in favor of plaintiff.   (See Docket No. 126.) Plaintiff submits several deeds and descriptions of the property which make its ultimate success seem likely, but, as before the magistrate judge, fall short of conclusively establishing their claim such that permanent injunctive relief regarding the cafeteria structure is warranted at this stage of the proceedings.   See id. Genuine issues of material fact remain regarding the boundary issue surrounding the disputed cafeteria structure, thus precluding entry of summary judgment in favor of plaintiff on this claim.   In order finally to resolve this issue, and any other remaining claims in this case, a bench trial is scheduled for **February 6, 2012 at 9:00 a.m.**

F.   **Permanent Injunctive Relief**

Plaintiff requests that the Court convert the preliminary injunction issued on August 29, 2008, into a permanent injunction. "Where a plaintiff seeks permanent injunctive relief, the test is the same [as the preliminary injunction standard], except that 'the movant must show actual success on the merits of the claim, rather than a mere likelihood of success.'"   Caroline T. v. Hudson Sch. Dist., 915 F.2d 752, 755 (1st Cir. 1990) (quoting K-Mart Corp. v.

Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir. 1989)).  Thus, "[i]n order to issue a permanent injunction, a district court typically must find (1) that the plaintiff has demonstrated actual success on the merits of its claims; (2) that the plaintiff would be irreparably injured in the absence of injunctive relief; (3) that the harm to the plaintiff from defendant's conduct would exceed the harm to the defendant accruing from the issuance of an injunction; and (4) that the public interest would not be adversely affected by an injunction."  United States v. Mass. Water Res. Auth., 256 F.3d 36, 51 n. 15 (1st Cir. 2001) (citing A.W. Chesterton Co. v. Chesterton, 128 F.3d 1, 5 (1st Cir. 1997)).

        Given the factors discussed above, there appears no genuine issue of material fact that would preclude judgment as a matter of law on plaintiff's claims regarding trademark issues and the validity of the franchise termination under the PMPA.  There remain, however, issues regarding the property dispute revolving around the cafeteria structure which could affect the scope of permanent injunctive relief in this case.  Accordingly, the Court will reserve judgment on the issuance of a permanent injunction until the conclusion of the bench trial scheduled for **February 6, 2012 at 9:00 a.m.**

        **G.   Plaintiff's Claim for Attorney's Fees**

        Plaintiff also requests summary judgment on its claim for attorney's fees pursuant to 15 U.S.C. §§ 1114(1), 1117(a), and the

Puerto Rico Civil Code.  (Docket No. 122 at 17-18.)  That request, however, is not accompanied by any developed arguments, evidentiary support, or legal authority.  (See Docket No. 122 at 17-18.) Generally, litigants in federal court are responsible for paying their own attorney's fees "in the absence of legislation providing otherwise . . . ."  Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n., 434 U.S. 412, 415 (1978) (citing Aleyska Pipeline Co. v. Wilderness Soc., 421 U.S. 240 (1975)).  In cases where attorney's fees may be awarded, the First Circuit Court of Appeals has adopted the "lodestar approach," under  which "the judge calculates the time counsel spent on the case, subtracts duplicative, unproductive, or excessive hours, and then applies prevailing rates in the community (taking into account the qualifications, experience, and specialized competence of the attorneys involved)."  Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 295 (1st Cir. 2001) (citing Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir. 1992); United States v. Metropolitan Dist. Comm'n., 847 F.2d 12, 15-17 (1st Cir. 1988); Grendel's Den., Inc. v. Larkin, 749 F.2d 945, 950-51 (1st Cir. 1984)).  The hourly rate to be applied "should be 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'"  Tejada-Batista v. Fuentes-Agostini, 263 F. Supp. 2d 321, 327 (D.P.R. 2003) (citing Blum v. Stenson, 465 U.S. 886, 895 n. 11 (1984)).  The burden of

establishing that the rates requested are comparable with the prevailing rates in the community is on the party moving for the award of attorney's fees.  Id. at 328.

        After calculating the initial amount of the award, attorney's fees may be "reduced because of (1) the overstaffing of a case, (2) the excessiveness of the hours expended on the legal research or the discovery proceedings, (3) the redundancy of the work exercised, or (4) the time spent on needless or unessential matters."  Ramos v. Davis & Geck, Inc., 968 F. Supp. 765, 775 (D.P.R. 1997) (citing Hensley v. Eckerhart, 461 U.S. 424, 432-35 (1983)).  The court may further consider the following factors:

> (1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to acceptance of the case; (5) The customary fee; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or the circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation and ability of the attorneys; (10) The "undesirability" of the case; (11) The nature and length of the professional relationship with the client; and (12) Awards in similar cases.

Id. (citing Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974)).

        Given the undeveloped nature of plaintiff's request, there is an insufficient basis to grant attorney's fees at this stage of the proceedings.  Any future request for attorney's fees must: (1) clearly identify and explain the basis for granting attorney's fees; (2) identify, and support, a requested hourly rate

appropriate for plaintiff's counsel's experience, qualifications, and the prevailing rates in the community; and (3) list, in detail, the hours spent working on this case, describing the services provided related to this case, the specific amount of time for each service provided, the date each service was provided, and the dollar amount billed for each service.

## CONCLUSION

For the reasons expressed above, defendants' motion for summary judgment, (Docket No. 114), and plaintiff's third motion for summary judgment, (Docket No. 125), are **DENIED**.  Plaintiff's first motion for summary judgment, (Docket No. 120), is **GRANTED** with regard to the validity of plaintiff's franchise termination under the PMPA and plaintiff's trademark infringement and dilution claims.  Plaintiff's second motion for summary judgment, (Docket No. 122), is **GRANTED** with regard to the breach of contract claims, and **DENIED** with regard to the request for attorney's fees.  The Court **HOLDS IN ABEYANCE** its judgment on plaintiff's request for permanent injunctive relief until the final resolution of the issues posed in plaintiff's third motion for summary judgment, (Docket No. 125).  In order to resolve those issues a bench trial shall be held on **February 6, 2012 at 9:00 a.m.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, September 30, 2011.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE